

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
MOBIL SOLUTIONS, LLC, DOUGLAS W. BELL,
AHMAD ALI, FAKHRY AJAJ,

                                                    **AMENDED COMPLAINT**
                                                    **Civil Action No. 13-cv-3115 (GBD)**
                              Plaintiffs,           **Jury Trial Demanded**

              -against-


AIO WIRELESS LLC, AT&T INC.,
AT&T MOBILITY LLC and WILLIAM HUNTER


                              Defendants.
-------------------------------------------------------------------x

Plaintiffs Mobil Solutions, LLC ("Mobil"), Douglas W. Bell ("Bell"), Ahmad Ali ("Ali"),

Fakhry Ajaj ("Ajaj") (collectively, the "Plaintiffs"), by their attorneys, the Law Offices of David

Carlebach, Esq., as and for their complaint against Defendants AIO Wireless, LLC ("AIO"),

AT&T Inc. and AT&T Mobility LLC (collectively "AT&T"), and William Hunter ("Hunter")

(collectively, the "Defendants"),  allege upon information and belief as follows:

RECEIVED
AUG 0 7 2013
U.S.D.C. S.D.N.Y.
CASHIERS

### PARTIES

1.      Plaintiff Mobil Solutions, LLC, is a domestic limited liability company with an

address at 110 Chestnut Ridge Road, Suite 173, Montvale, New Jersey 07645.

2.      Plaintiff Bell is an individual residing at 65 Wierimus Road, Hillsdale, New Jersey 07642 and is a managing member of Plaintiff Mobil.

3.      Plaintiff Ali is an individual residing at 12347 Antille Drive, Boca Raton, Florida 33428 and is a managing member of Plaintiff Mobil.

4.      Plaintiff Ajaj is an individual residing at 27 Franklin Avenue, Wellington, New Jersey 07057and is a managing member of Plaintiff Mobil.

5.      Upon information and belief, Defendant AIO Wireless, LLC, is a domestic limited liability company with an address at 12735 Morris Road, Building 200, Alpharetta, Georgia 30004, and is an affiliate and wholly owned by Defendant AT&T.

6.      Upon information and belief, Defendant AT&T Inc., is a Delaware corporation doing business in the State of New York.

7.      Upon information and belief, Defendant AT&T Mobility LLC, is a Delaware limited liability corporation doing business in the State of New York.

8.      Upon information and belief, Defendant Hunter is an individual residing in Atlanta, Georgia.

## JURISDICTION AND VENUE

9.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 exclusive of interest and costs, and because the parties are citizens of different States.

10.      Venue is proper under 28 U.S.C. § 1391(a) because AT&T does business in this judicial district.

## STATEMENT OF FACTS

11.      In or about November of 2012 Hunter contacted Bell about getting involved in a new business venture of AT&T called AIO.  Essentially, AT&T has been involved to date with contract wireless service whereby customers sign up for one to two year service plans.  At&T was seeking to start a new business venture involving service without contracts but rather monthly, pay as you go, flat fee service.   This model is used by Metro PCS, T-Mobile and other companies and generally targets lower income customers.  To this end AT&T formed AIO. Hunter found Bell on Linked in where he saw that Bell had vast experience in the industry and was currently CEO of Epic Wireless ("Epic") which at the time was a non-exclusive Master Dealer for Ultra Mobile and PTel Mobile selling SIM Cards to dealers across the country.

12.      Thereafter, Hunter contacted Bell about joining the new initiative.  In order to get involved, Bell was asked by Hunter to sign a non-disclosure agreement (the "NDA") which Bell

3

did on November 28, 2012. Bell had his first conference call with Hunter to go over the program on December 3, 2012.

13.     Hunter expressed interested in becoming part of the new program, and advised Hunter that he needed to discuss it with Epic, his present organization, and would get back to him. After internal discussions at Epic, it was decided that Epic wanted to move forward with the new initiative.

14.     Accordingly, Bell called Hunter and asked him if the contract should be signed under Epic. Hunter replied that a brand new company should be formed which would be exclusive to AIO. Bell thereafter formed an exclusive entity, but affiliated with Epic, to contract with AIO called Thunder Communications. Hunter was aware that Epic was continuing to do business.

15.     In furtherance of the business discussions Bell scheduled a trip to Orlando/Tampa at the end of January, 2013, to start scouting for retail locations. Before Bell went he received a call from Ali and Ajaj, dealers he had done business with when he worked at Metro PCS. When Bell advised them that he was heading to Florida they were aware of the purpose of his trip because Bill Hunter had reached out to them as well via Linked in with respect to the AIO initiative.

4

16.     Ali and Ajaj joined Bell on his trip to Florida to scout locations. While in Tampa the Plaintiffs drove around with authorized ATT Realtors because at the time they were the only ones with the locations that had been pre-approved as being suitable.  Thereafter the group traveled to Orlando and spent two days driving through that market looking for locations.  After each day Bell submitted locations for possible Letters of Intent ("LOI") and received either an approval from ATT or a denial.

17.     After that week in Florida, Ahmad and Bell had discussions about combining forces into one company and going into the AIO venture on a larger scale.  Ahmad was currently running stores for All Cellular, a big National Metro Dealer and Bell was currently the CEO of Epic Wireless and the President of Thunder Communications, Inc.  Once Bell and Ahmad came to an agreement they decided to resign from their current roles.

18.     Thereafter, Bell called Hunter at the end of February, 2013 and told him that he would be resigning from his current position with Epic as well as Thunder to create a new company with partners that are currently doing Metro PCS.  They would go all in with this new venture and try to build 50+ stores Nation Wide.  Hunter was pleased with this development and indeed sent a new contract to sign under the new Mobil Solutions, LLC (the "Contract" Exhibit A") which was formed in early March, 2013. Bell sent Hunter an email telling him to cancel Thunder Communications because Bell was longer at Epic and Epic would be closing it down. Bell further advised Hunter that Epic wanted a few AIO stores independent of Bell if he could

send them a new contract to sign for themselves. In connection therewith, Hunter, indeed, sent Epic an email with a new contract to be signed.

19.    After Bell resigned from Epic and Thunder, Ahmad resigned from All Cellular as well so they could concentrate on making Mobil Solutions, LLC a big success. Bell scheduled another trip to Orlando to get everything in place and scout locations with the ATT employee Denise Johnson and the Orlando Realtor, Janet Galvin, for two days. With Bell the entire time was Ali, who knew Orlando and helped Bell pick the correct stores.

20.    As a result of these efforts, Mobil finalized its position in Orlando and engaged a Florida lawyer to draft and close the leases. Bell was on a weekly conference call with Denise Johnson ("Johnson"), an AT&T employee, urging him to hurry up and get the leases executed and the floor plans done so that fixtures can be ordered. Johnson also advised Bell to order computers and flat wires and everything else needed for the stores but, of course, only from approved AT&T vendors.

21.    Bell spent over $150,000.00 on Dell computers required for each of the stores, arranged for the sign company do their required site visits and get the drawings for approval. Mobil sent employees to Tampa and Orlando to measure the stores and take pictures so the fixture company could render the drawings for the $20,000.00 in fixtures required. During this time Mobil signed Seven (7) leases in Tampa and Four (4) in Orlando with Three (3) more in process with counsel in Orlando.

22.     Shortly thereafter, in early April, 2013, Bell received a call from Hunter inquiring what he did to upset Denise Johnson because "she didn't like us [Mobil] and was questioning whether we owned the leases or we got sub dealers to sign them".  Hunter further advised Bell to call her and "try to smooth it out and make her feel good." Bell was not sure what Hunter was referring to since Mobil and its agents had done nothing wrong, had been completely up front about all of its efforts, which Johnson and Hunter had both been involved in on a granular level, and Mobil had, indeed, already made a substantial, personal and financial commitment and investment to the venture pursuant to the Contract.

23.     On that same call, Hunter further advised Bell that Mobil was being summoned to Atlanta for a meeting with him and his boss, Jake Mullins and a few more people.   Hunter advised Bell to call him before the meeting so he could prep him on what to say and not to say. Bell advised Hunter that he would come with all of the Mobil partners.  He further advised Hunter that one of them is a Metro PCS dealer and he would be interested in discussing converting his stores, similar to other Metro PCS conversions that AIO had been effectuating.

24.     At the meeting, the tone of AT&T/AIO was accusatory, and they were clearly seeking to contrive and fabricate reasons to unlawfully terminate the Contract. Mobil was questioned by AT&T/AIO whether Mobil had "sub-dealers", which was not the case.  They claimed that they had been contacted by an individual who claimed that Mobil was trying to get him to be a sub-dealer, but refused to identify him.  Indeed, at the meeting, AT&T/AIO had the

temerity to accuse Mobil of having other people or entities sign the leases, to buttress their phony "sub-dealer" claim. That was refuted on the spot, when it was pointed out by Mobil that all the leases were right in front of them, and indeed had been there for weeks. AT&T quickly backtracked from that accusation as a "mistake". It was obviously not a mistake and demonstrated beyond cavil the completely contrived and fabricated nature of the meeting. Apparently, solely as a result of a personal vendetta, AT&T, was looking for a way to breach its obligations under the Contract.

25.     Indeed, not only had Bell signed each and every lease on behalf of Mobil, Bell had personally guaranteed four of those leases, as did Ajaj and as did an entity known as Airlink, NY LLC. Thus, Mobil was the signatory on every lease and only had a third party guarantee on one of the leases to spread the risk.

26.     At the conclusion of the meeting it seemed as if some kind of resolution had been reached. Mobil further advised Defendants that it would like to convert those additional Metro PCS stores to the AIO venture. Hunter stated that a further meeting would be set up the following week. After the meeting Mobil was shown the mock store and at that time Hunter advised Bell "that it went ok and we should be fine".

27.     Thereafter, while waiting to hear from Defendants about another meeting the following week, Mobil got approvals for an additional Six (6) South Florida stores, after submitting over Twenty Five (25) proposed locations the very next day after the meeting was

over. So at that point Mobil had Eleven (11) leases signed, was working on Three (3) more in Orlando and had Eleven (11) LOI approvals working in South Florida where Mobil wanted an additional Twenty (20) stores.

28.     Furthermore, Bell was still setting up credit card billing and the radio that was required and was calling Johnson and Hunter and other representatives to find out where the promised funding pursuant to the Contract, which Mobil was owed over $200,000.00, to help fund the stores. Mobil was told it took Seven (7) to (10) days to process the funding requests and, indeed, when Bell was in Atlanta, Hunter advised him that he personally processed a few of Mobil's requests. It was now over Fourteen (14) days and Mobil still had not received any funding. Mobil had also only received three approved floor plans and was waiting on eight (8) more.

29.     No one called back or gave Bell any information, until Johnson called back and advised Bell not to sign any more leases as they were trying to "re-look" at the distribution in Orlando and Tampa and that "the realtors know". Bell called the realtor, because he had a lease signed and ready to send, but the realtor had no idea what Johnson was talking about and advised Bell that he was instructed to continuing looking for store locations.

30.     Bell then got a call from Hunter telling him that Mobil had been terminated and a Letter was coming as well as an email and he couldn't talk to Bell about anything else.

31.     Thereafter on April 17, 2013, a termination letter (the "Termination Letter" Exhibit B") was sent to Mobil with the following pertinent paragraph:

> The bases for terminating the Dealer Agreements are Dealer's numerous material breaches and other improper conduct. Specifically, Dealer induced Company to enter into the Dealer Agreements by making material misrepresentations or omissions regarding the true ownership of Dealer, the fact that Affiliates of Dealer are current distributors for MetroPCS and intend to continue doing so in the immediate future, and the fact that Dealer intended to surreptitiously establish improper sub-dealer relationships. Moreover, as a result of such conduct and, among other things, Dealer and/or its Affiliates' violation of exclusivity obligations; disclosure of Company's Confidential Information to third parties; establishment of improper sub-dealer relationships; and other conduct, Dealer and/or its Affiliates breached Sections 2.5.3, 2.7.1, 2.7.2, 4.1, 4.2, 4.7, 4.13 of the Dealer Agreements.

In summary, there are four grounds cited for the termination (1) misrepresentations regarding the true ownership of Mobil (2) that affiliates of Mobil are distributors for Metro PCS (3) that Mobil intended to surreptitiously establish sub-dealer relationships and that (4) Mobil disclosed confidential information.

32.     All of these bases however are demonstrably false on their face and were nothing more than contrived and fabricated excuses for the termination based on a personal vendetta by Johnson or others.  There was never any attempt to hide the ownership of Mobil and at all times Defendant's were aware of the ownership of Mobil.

33.     Moreover, Defendants were well aware that some of the owners were former Metro PCS dealers.  Defendants actively sought to convert prior Metro PCS owners to the new venture which was part of their business model.  Indeed, Hunter independently contacted Ali and

10

Ajaj seeking to involve them in the venture based on their involvement with Metro PCS.   Nor is there any restriction in the Contract on a corporate signatory to the Contract having independent business ventures on a personal level.   In that regard, initially Defendants signed the Contract with Thunder, an affiliate of Epic, knowing full well that Epic was continuing to do independent business.

34.     Finally, the notion of illicit "sub-dealer" relationships was nothing more than a defamatory canard, with no basis in fact whatsoever.  The notion that Mobil breached the NDA is similarly ridiculous as it only disclosed information as necessary to its agents and prospective employees of its store as contemplated under the Contract.

35.     In summary, Mobil, whose principals all have impeccable business reputations, at all times acted honorably and in an upright and straight forward manner in their business dealings with Defendants.   Moreover, each of the individual Plaintiff's, in reliance on the good faith promises and the Contract signed with Defendants, relinquished existing businesses to go full steam into the venture with Defendant.   Indeed, they were recruited by Defendants as a result of their reputations and experience in this industry.  They also invested substantial personal sums to set up the business as well as committed themselves to significant personal liability by signing personally on many of the leases.

36.     Notwithstanding all of the above, Defendants turned on a dime, based on the personal vendetta of one of their employees and simply abrogated every aspect of the Contract and disregarded all of the sacrifice, investment and committment of Plaintiff's to the venture.

## FIRST CAUSE OF ACTION

### (By Plaintiffs Against all Defendants for Breach of Contract)

37.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 36 of the complaint as if fully set forth herein.

38.     As set forth above, Plaintiff Mobil entered into the Contract which was egregiously breached by Defendants through the baseless and false Termination Letter for contrived and fabricated reasons.

39.     As a result of Defendants breach each of the Plaintiff's have actual damages in an amount to be determined at trial but not less than $20,000,000.00 and collectively have consequential damages in an amount to be determined at trial but not less than $100,000,000.00 dollars.

## SECOND CAUSE OF ACTION

### (By Plaintiffs Bell, Ali and Ajaj Against All the Defendant's for Promissory Estoppel and Detrimental Reliance)

40.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 39 of the Complaint as if fully set forth herein.

41.     Plaintiffs Bell, Ali and Ajaj, as a result of the promises made by Defendants, gave up existing jobs and businesses to join the venture of Defendants.

42.     Defendants knew that Plaintiffs Bell, Ali and Ajaj, in reliance on Defendants promises, were going to relinquish their existing businesses in order to join Defendants venture and indeed sought to induce Plaintiffs to do same.  Plaintiffs relied on those promises to their detriment.

43.     As a result of Defendants false promises Bell, Ajaj and Ali have each individually been damaged in an amount to be determined at trial but not less than $20,000,000.00.

## THIRD CAUSE OF ACTION

### (By Plaintiffs Against All Defendants for Fraud)

44.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 43 of the complaint as if fully set forth herein.

13

45.     Defendants misrepresented to Plaintiffs their intentions to enter into and honor their obligations under the Contract.

46.     In particular, as set forth above, Defendants continued to induce Plaintiff's into honoring their obligations under the Contract, while knowing full well that they intended to breach and had no intention of honoring their obligations.

47.     Furthermore, the reasons given in the Termination Letter are facially false, phony and contrived as evidenced by the false accusation by the meeting that Plaintiffs had not signed the leases – when the leases had been in Defendant's offices for weeks with only the signature of Bell on behalf of Mobil – and which accusation Defendants had to back off when proved wrong.

48.     As a result of Defendants fraud, Plaintiff's have been damaged in an amount not less than $100,000,000.00 dollars.

## FOURTH CAUSE OF ACTION

**(By Plaintiffs Against All Defendants for Fraud in the Inducement)**

49.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 48 of the complaint as if fully set forth herein.

50.     Defendants misrepresented to Plaintiffs their intentions to enter into and honor their obligations under the Contract.

51.     In particular, as set forth above, Defendants continued to induce Plaintiff's into honoring their obligations under the Contract, while knowing full well that they intended to breach and had no intention of honoring their obligations.

52.     Defendants fraudulently induced Plaintiffs into signing the Contract, with full knowledge that they intended to breach the Contract, so that Defendants could benefit from the efforts and resources Plaintiffs expended in obtaining the leases.

53.     Defendants had no intention of honoring their obligations from the very beginning of contractual relations with Plaintiffs and used the misrepresentations about their intentions to adhere to the Contract to lure the Plaintiffs into sighing the Contract and expending their efforts and resources.

54.     As a result of Defendants fraud in the inducement, Plaintiff's have been damaged in an amount not less than $100,000,000.00 dollars.

## FIFTH CAUSE OF ACTION

### (By Plaintiffs Against All Defendants for Unjust Enrichment)

55.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 54 of the complaint as if fully set forth herein.

56.    As set forth extensively above, Plaintiff's expended enormous effort and energy and funds into developing the business model and market penetration for South Florida of Defendants venture based on their knowledge and experience of the industry and that particular geographical market.

57.    Defendants availed themselves of the expertise, knowledge and experience and of Plaintiffs, observed how Plaintiffs intended to implement their business model as well as the execution of same and having gleaned all that information summarily and illegally terminated the Contract. Defendants have, thus, financially benefitted at Plaintiffs expense and have unjustly enriched themselves at Plaintiffs expense.

58.    Plaintiff's do not have an adequate remedy at law.

59.    Plaintiff's have been damaged in an amount to be determined at trial but not less then the amount of $100,000,000.00.

## SIXTH CAUSE OF ACTION

**(By All Plaintiffs Against Defendants AT&T and AIO for Breach of Contract and Specific Performance)**

60.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 59 of the complaint as if fully set forth herein.

61.     As set forth above, Plaintiff Mobil entered into a Contract with Defendant AIO. AIO egregiously breached the Contract by illegally terminating the Contract for contrived and fabricated reasons.

62.     Plaintiff's seek the remedy of specific performance whereby Defendants be compelled to honor their contractual obligations to Defendants.

## SEVENTH CAUSE OF ACTION

**(By Plaintiffs for Preliminary Injunction Against All Defendants)**

63.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 62 of the Complaint as if fully set forth herein.

64.     Defendants conduct continues to irreparably harm Plaintiffs.

65.     Plaintiffs are likely to succeed on the merits of the Complaint.



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
MOBIL SOLUTIONS, LLC, DOUGLAS W. BELL,
AHMAD ALI, FAKHRY AJAJ,

                                                    **AMENDED COMPLAINT**
                                                    **Civil Action No. 13-cv-3115 (GBD)**
                        Plaintiffs,                 **Jury Trial Demanded**

          -against-


AIO WIRELESS LLC, AT&T INC.,
AT&T MOBILITY LLC and WILLIAM HUNTER


                        Defendants.
-----------------------------------------------------------------x

      Plaintiffs Mobil Solutions, LLC ("Mobil"), Douglas W. Bell ("Bell"), Ahmad Ali ("Ali"),

Fakhry Ajaj ("Ajaj") (collectively, the "Plaintiffs"), by their attorneys, the Law Offices of David

Carlebach, Esq., as and for their complaint against Defendants AIO Wireless, LLC ("AIO"),

AT&T Inc. and AT&T Mobility LLC (collectively "AT&T"), and William Hunter ("Hunter")

(collectively, the "Defendants"), allege upon information and belief as follows:

RECEIVED
AUG 0 7 2013
U.S.D.C. S.D.N.Y.
CASHIERS

                                **PARTIES**


    1.    Plaintiff Mobil Solutions, LLC, is a domestic limited liability company with an

address at 110 Chestnut Ridge Road, Suite 173, Montvale, New Jersey 07645.

2.      Plaintiff Bell is an individual residing at 65 Wierimus Road, Hillsdale, New Jersey 07642 and is a managing member of Plaintiff Mobil.

3.      Plaintiff Ali is an individual residing at 12347 Antille Drive, Boca Raton, Florida 33428 and is a managing member of Plaintiff Mobil.

4.      Plaintiff Ajaj is an individual residing at 27 Franklin Avenue, Wellington, New Jersey 07057and is a managing member of Plaintiff Mobil.

5.      Upon information and belief, Defendant AIO Wireless, LLC, is a domestic limited liability company with an address at 12735 Morris Road, Building 200, Alpharetta, Georgia 30004, and is an affiliate and wholly owned by Defendant AT&T.

6.      Upon information and belief, Defendant AT&T Inc., is a Delaware corporation doing business in the State of New York.

7.      Upon information and belief, Defendant AT&T Mobility LLC, is a Delaware limited liability corporation doing business in the State of New York.

8.      Upon information and belief, Defendant Hunter is an individual residing in Atlanta, Georgia.

2

## JURISDICTION AND VENUE

9.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 exclusive of interest and costs, and because the parties are citizens of different States.

10.     Venue is proper under 28 U.S.C. § 1391(a) because AT&T does business in this judicial district.

## STATEMENT OF FACTS

11.     In or about November of 2012 Hunter contacted Bell about getting involved in a new business venture of AT&T called AIO.  Essentially, AT&T has been involved to date with contract wireless service whereby customers sign up for one to two year service plans.  At&T was seeking to start a new business venture involving service without contracts but rather monthly, pay as you go, flat fee service.   This model is used by Metro PCS, T-Mobile and other companies and generally targets lower income customers.  To this end AT&T formed AIO. Hunter found Bell on Linked in where he saw that Bell had vast experience in the industry and was currently CEO of Epic Wireless ("Epic") which at the time was a non-exclusive Master Dealer for Ultra Mobile and PTel Mobile selling SIM Cards to dealers across the country.

12.     Thereafter, Hunter contacted Bell about joining the new initiative.  In order to get involved, Bell was asked by Hunter to sign a non-disclosure agreement (the "NDA") which Bell

3

did on November 28, 2012.  Bell had his first conference call with Hunter to go over the program on December 3, 2012.

13.      Hunter expressed interested in becoming part of the new program, and advised Hunter that he needed to discuss it with Epic, his present organization, and would get back to him.  After internal discussions at Epic, it was decided that Epic wanted to move forward with the new initiative.

14.      Accordingly, Bell called Hunter and asked him if the contract should be signed under Epic.  Hunter replied that a brand new company should be formed which would be exclusive to AIO.   Bell thereafter formed an exclusive entity, but affiliated with Epic,  to contract with AIO called Thunder Communications.  Hunter was aware that Epic was continuing to do business.

15.      In furtherance of the business discussions Bell scheduled a trip to Orlando/Tampa at the end of January, 2013, to start scouting for retail locations.  Before Bell went he received a call from Ali and Ajaj, dealers he had done business with when he worked at Metro PCS.   When Bell advised them that he was heading to Florida they were aware of the purpose of his trip because  Bill Hunter had reached out to them as well via Linked in with respect to the AIO initiative.

4

16.     Ali and Ajaj joined Bell on his trip to Florida to scout locations. While in Tampa the Plaintiffs drove around with authorized ATT Realtors because at the time they were the only ones with the locations that had been pre-approved as being suitable.  Thereafter the group traveled to Orlando and spent two days driving through that market looking for locations.  After each day Bell submitted locations for possible Letters of Intent ("LOI") and received either an approval from ATT or a denial.

17.     After that week in Florida, Ahmad and Bell had discussions about combining forces into one company and going into the AIO venture on a larger scale.  Ahmad was currently running stores for All Cellular, a big National Metro Dealer and Bell was currently the CEO of Epic Wireless and the President of Thunder Communications, Inc.  Once Bell and Ahmad came to an agreement they decided to resign from their current roles.

18.     Thereafter, Bell called Hunter at the end of February, 2013 and told him that he would be resigning from his current position with Epic as well as Thunder to create a new company with partners that are currently doing Metro PCS.  They would go all in with this new venture and try to build 50+ stores Nation Wide.  Hunter was pleased with this development and indeed sent a new contract to sign under the new Mobil Solutions, LLC (the "Contract" Exhibit A") which was formed in early March, 2013. Bell sent Hunter an email telling him to cancel Thunder Communications because Bell was longer at Epic and Epic would be closing it down. Bell further advised Hunter that Epic wanted a few AIO stores independent of Bell if he could

send them a new contract to sign for themselves.  In connection therewith, Hunter, indeed, sent Epic an email with a new contract to be signed.

19.     After Bell resigned from Epic and Thunder, Ahmad resigned from All Cellular as well so they could concentrate on making Mobil Solutions, LLC a big success.  Bell scheduled another trip to Orlando to get everything in place and scout locations with the ATT employee Denise Johnson and the Orlando Realtor, Janet Galvin, for two days.  With Bell the entire time was Ali, who knew Orlando and helped Bell pick the correct stores.

20.     As a result of these efforts, Mobil finalized its position in Orlando and engaged a Florida lawyer to draft and close the leases.  Bell was on a weekly conference call with Denise Johnson ("Johnson"), an AT&T employee, urging him to hurry up and get the leases executed and the floor plans done so that fixtures can be ordered.  Johnson also advised Bell to order computers and flat wires and everything else needed for the stores but, of course, only from approved AT&T vendors.

21.     Bell spent over $150,000.00 on Dell computers required for each of the stores, arranged for the sign company do their required site visits and get the drawings for approval. Mobil sent employees to Tampa and Orlando to measure the stores and take pictures so the fixture company could render the drawings for the $20,000.00 in fixtures required. During this time Mobil signed Seven (7) leases in Tampa and Four (4) in Orlando with Three (3) more in process with counsel in Orlando.

22.     Shortly thereafter, in early April, 2013, Bell received a call from Hunter inquiring what he did to upset Denise Johnson because "she didn't like us [Mobil] and was questioning whether we owned the leases or we got sub dealers to sign them". Hunter further advised Bell to call her and "try to smooth it out and make her feel good." Bell was not sure what Hunter was referring to since Mobil and its agents had done nothing wrong, had been completely up front about all of its efforts, which Johnson and Hunter had both been involved in on a granular level, and Mobil had, indeed, already made a substantial, personal and financial commitment and investment to the venture pursuant to the Contract.

23.     On that same call, Hunter further advised Bell that Mobil was being summoned to Atlanta for a meeting with him and his boss, Jake Mullins and a few more people.   Hunter advised Bell to call him before the meeting so he could prep him on what to say and not to say. Bell advised Hunter that he would come with all of the Mobil partners.  He further advised Hunter that one of them is a Metro PCS dealer and he would be interested in discussing converting his stores, similar to other Metro PCS conversions that AIO had been effectuating.

24.     At the meeting, the tone of AT&T/AIO was accusatory, and they were clearly seeking to contrive and fabricate reasons to unlawfully terminate the Contract. Mobil was questioned by AT&T/AIO whether Mobil had "sub-dealers", which was not the case.  They claimed that they had been contacted by an individual who claimed that Mobil was trying to get him to be a sub-dealer, but refused to identify him.  Indeed, at the meeting, AT&T/AIO had the

7

temerity to accuse Mobil of having other people or entities sign the leases, to buttress their phony "sub-dealer" claim.  That was refuted on the spot, when it was pointed out by Mobil that all the leases were right in front of them, and indeed had been there for weeks.  AT&T quickly backtracked from that accusation as a "mistake".  It was obviously not a mistake and demonstrated beyond cavil the completely contrived and fabricated nature of the meeting. Apparently, solely as a result of a personal vendetta, AT&T, was looking for a way to breach its obligations under the Contract.

25.    Indeed, not only had Bell signed each and every lease on behalf of Mobil, Bell had personally guaranteed four of those leases, as did Ajaj and as did an entity known as Airlink, NY LLC.  Thus, Mobil was the signatory on every lease and only had a third party guarantee on one of the leases to spread the risk.

26.    At the conclusion of the meeting it seemed as if some kind of resolution had been reached.  Mobil further advised Defendants that it would like to convert those additional Metro PCS stores to the AIO venture.  Hunter stated that a further meeting would be set up the following week.  After the meeting Mobil was shown the mock store and at that time Hunter advised Bell "that it went ok and we should be fine".

27.    Thereafter, while waiting to hear from Defendants about another meeting the following week, Mobil got approvals for an additional Six (6) South Florida stores, after submitting over Twenty Five (25) proposed locations the very next day after the meeting was

8

over.  So at that point Mobil had Eleven (11) leases signed, was working on Three (3) more in Orlando and had Eleven (11) LOI approvals working in South Florida where Mobil wanted an additional Twenty (20) stores.

28.     Furthermore, Bell was still setting up credit card billing and the radio that was required and was calling Johnson and Hunter and other representatives to find out where the promised funding pursuant to the Contract, which Mobil was owed over $200,000.00, to help fund the stores.  Mobil was told it took Seven (7) to (10) days to process the funding requests and, indeed, when Bell was in Atlanta, Hunter advised him that he personally processed a few of Mobil's requests.  It was now over Fourteen (14) days and Mobil still had not received any funding.  Mobil had also only received three approved floor plans and was waiting on eight (8) more.

29.     No one called back or gave Bell any information, until Johnson called back and advised Bell not to sign any more leases as they were trying to "re-look" at the distribution in Orlando and Tampa and that "the realtors know".  Bell called the realtor, because he had a lease signed and ready to send, but the realtor had no idea what Johnson was talking about and advised Bell that he was instructed to continuing looking for store locations.

30.     Bell then got a call from Hunter telling him that Mobil had been terminated and a Letter was coming as well as an email and he couldn't talk to Bell about anything else.

31.     Thereafter on April 17, 2013, a termination letter (the "Termination Letter" Exhibit B") was sent to Mobil with the following pertinent paragraph:

> The bases for terminating the Dealer Agreements are Dealer's numerous material breaches and other improper conduct. Specifically, Dealer induced Company to enter into the Dealer Agreements by making material misrepresentations or omissions regarding the true ownership of Dealer, the fact that Affiliates of Dealer are current distributors for MetroPCS and intend to continue doing so in the immediate future, and the fact that Dealer intended to surreptitiously establish improper sub-dealer relationships. Moreover, as a result of such conduct and, among other things, Dealer and/or its Affiliates' violation of exclusivity obligations; disclosure of Company's Confidential Information to third parties; establishment of improper sub-dealer relationships; and other conduct, Dealer and/or its Affiliates breached Sections 2.5.3, 2.7.1, 2.7.2, 4.1, 4.2, 4.7, 4.13 of the Dealer Agreements.

In summary, there are four grounds cited for the termination (1) misrepresentations regarding the true ownership of Mobil (2) that affiliates of Mobil are distributors for Metro PCS (3) that Mobil intended to surreptitiously establish sub-dealer relationships and that (4) Mobil disclosed confidential information.

32.     All of these bases however are demonstrably false on their face and were nothing more than contrived and fabricated excuses for the termination based on a personal vendetta by Johnson or others. There was never any attempt to hide the ownership of Mobil and at all times Defendant's were aware of the ownership of Mobil.

33.     Moreover, Defendants were well aware that some of the owners were former Metro PCS dealers. Defendants actively sought to convert prior Metro PCS owners to the new venture which was part of their business model. Indeed, Hunter independently contacted Ali and

Ajaj seeking to involve them in the venture based on their involvement with Metro PCS.   Nor is there any restriction in the Contract on a corporate signatory to the Contract having independent business ventures on a personal level.   In that regard, initially Defendants signed the Contract with Thunder, an affiliate of Epic, knowing full well that Epic was continuing to do independent business.

34.     Finally, the notion of illicit "sub-dealer" relationships was nothing more than a defamatory canard, with no basis in fact whatsoever.   The notion that Mobil breached the NDA is similarly ridiculous as it only disclosed information as necessary to its agents and prospective employees of its store as contemplated under the Contract.

35.     In summary, Mobil, whose principals all have impeccable business reputations, at all times acted honorably and in an upright and straight forward manner in their business dealings with Defendants.   Moreover, each of the individual Plaintiff's, in reliance on the good faith promises and the Contract signed with Defendants, relinquished existing businesses to go full steam into the venture with Defendant.   Indeed, they were recruited by Defendants as a result of their reputations and experience in this industry.   They also invested substantial personal sums to set up the business as well as committed themselves to significant personal liability by signing personally on many of the leases.

36.     Notwithstanding all of the above, Defendants turned on a dime, based on the personal vendetta of one of their employees and simply abrogated every aspect of the Contract and disregarded all of the sacrifice, investment and committment of Plaintiff's to the venture.

## FIRST CAUSE OF ACTION

### (By Plaintiffs Against all Defendants for Breach of Contract)

37.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 36 of the complaint as if fully set forth herein.

38.     As set forth above, Plaintiff Mobil entered into the Contract which was egregiously breached by Defendants through the baseless and false Termination Letter for contrived and fabricated reasons.

39.     As a result of Defendants breach each of the Plaintiff's have actual damages in an amount to be determined at trial but not less than $20,000,000.00 and collectively have consequential damages in an amount to be determined at trial but not less than $100,000,000.00 dollars.

## SECOND CAUSE OF ACTION

**(By Plaintiffs Bell, Ali and Ajaj Against All the Defendant's for Promissory Estoppel and Detrimental Reliance)**

40.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 39 of the Complaint as if fully set forth herein.

41.     Plaintiffs Bell, Ali and Ajaj, as a result of the promises made by Defendants, gave up existing jobs and businesses to join the venture of Defendants.

42.     Defendants knew that Plaintiffs Bell, Ali and Ajaj, in reliance on Defendants promises, were going to relinquish their existing businesses in order to join Defendants venture and indeed sought to induce Plaintiffs to do same.  Plaintiffs relied on those promises to their detriment.

43.     As a result of Defendants false promises Bell, Ajaj and Ali have each individually been damaged in an amount to be determined at trial but not less than $20,000,000.00.

## THIRD CAUSE OF ACTION

**(By Plaintiffs Against All Defendants for Fraud)**

44.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 43 of the complaint as if fully set forth herein.

13

45.     Defendants misrepresented to Plaintiffs their intentions to enter into and honor their obligations under the Contract.

46.     In particular, as set forth above, Defendants continued to induce Plaintiff's into honoring their obligations under the Contract, while knowing full well that they intended to breach and had no intention of honoring their obligations.

47.     Furthermore, the reasons given in the Termination Letter are facially false, phony and contrived as evidenced by the false accusation by the meeting that Plaintiffs had not signed the leases – when the leases had been in Defendant's offices for weeks with only the signature of Bell on behalf of Mobil – and which accusation Defendants had to back off when proved wrong.

48.     As a result of Defendants fraud, Plaintiff's have been damaged in an amount not less than $100,000,000.00 dollars.

## FOURTH CAUSE OF ACTION

### (By Plaintiffs Against All Defendants for Fraud in the Inducement)

49.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 48 of the complaint as if fully set forth herein.

14

50.    Defendants misrepresented to Plaintiffs their intentions to enter into and honor their obligations under the Contract.

51.    In particular, as set forth above, Defendants continued to induce Plaintiff's into honoring their obligations under the Contract, while knowing full well that they intended to breach and had no intention of honoring their obligations.

52.    Defendants fraudulently induced Plaintiffs into signing the Contract, with full knowledge that they intended to breach the Contract, so that Defendants could benefit from the efforts and resources Plaintiffs expended in obtaining the leases.

53.    Defendants had no intention of honoring their obligations from the very beginning of contractual relations with Plaintiffs and used the misrepresentations about their intentions to adhere to the Contract to lure the Plaintiffs into sighing the Contract and expending their efforts and resources.

54.    As a result of Defendants fraud in the inducement, Plaintiff's have been damaged in an amount not less than $100,000,000.00 dollars.

## FIFTH CAUSE OF ACTION

### (By Plaintiffs Against All Defendants for Unjust Enrichment)

55.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 54 of the complaint as if fully set forth herein.

56.     As set forth extensively above, Plaintiff's expended enormous effort and energy and funds into developing the business model and market penetration for South Florida of Defendants venture based on their knowledge and experience of the industry and that particular geographical market.

57.     Defendants availed themselves of the expertise, knowledge and experience and of Plaintiffs, observed how Plaintiffs intended to implement their business model as well as the execution of same and having gleaned all that information summarily and illegally terminated the Contract. Defendants have, thus, financially benefitted at Plaintiffs expense and have unjustly enriched themselves at Plaintiffs expense.

58.     Plaintiff's do not have an adequate remedy at law.

59.     Plaintiff's have been damaged in an amount to be determined at trial but not less then the amount of $100,000,000.00.

16

## SIXTH CAUSE OF ACTION

**(By All Plaintiffs Against Defendants AT&T and AIO for Breach of Contract and Specific Performance)**

60.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 59 of the complaint as if fully set forth herein.

61.     As set forth above, Plaintiff Mobil entered into a Contract with Defendant AIO. AIO egregiously breached the Contract by illegally terminating the Contract for contrived and fabricated reasons.

62.     Plaintiff's seek the remedy of specific performance whereby Defendants be compelled to honor their contractual obligations to Defendants.

## SEVENTH CAUSE OF ACTION

**(By Plaintiffs for Preliminary Injunction Against All Defendants)**

63.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 62 of the Complaint as if fully set forth herein.

64.     Defendants conduct continues to irreparably harm Plaintiffs.

65.     Plaintiffs are likely to succeed on the merits of the Complaint.

17

66.     Plaintiffs do not have an adequate remedy at law.


67.     In order to prevent further loss to Plaintiffs, the Court should enter an order enjoining Defendants from further breaching the Contract and directing Defendants to immediately honor their contractual obligations to Plaintiffs to prevent further damage and loss to Defendants.


**WHEREFORE,** this Court should grant judgment in favor of the Plaintiffs as follows:

a.     For the First Cause of Action, judgment for damages in favor of Plaintiff's in an amount to be determined at trial, at least in the amount of $120,000,000.00;

b.     For the Second Cause of Action, judgment for damages in favor of Bell, Ali and Ajaj in an amount to be determined at trial, but at least in the amount of $20,000,000.00 for each plaintiff;

c.     For the Third Cause of Action, judgment for damages in favor of Plaintiffs in an amount to be determined at trial but not less than $100,000,000.00;

d.     For the Fourth Cause of Action, judgment for damages in favor of Plaintiffs in an amount to be determined at trial but not less than $100,000,000.00;

e.     For the Fifth Cause of Action, judgment for damages in favor of  in favor of Plaintiffs in an amount to be determined at trial but not less than $100,000,000.00;

f.     For the Sixth Cause of Action, a judgment granting Plaintiffs specific performance against defendants and requiring them to honor their obligations under the contract;

g.     For the Seventh Cause of Action, a preliminary injunction enjoining defendants from taking any further action in breach of the Contract and requiring them to honor all of their commitment under the Contract.

18

h.       Granting such other, further and different relief as may be just and proper under the circumstances.

Dated: New York, New York
       August 8, 2013

**THE LAW OFFICES OF DAVID CARLEBACH, ESQ.**
Attorneys for Plaintiffs

By:

       David Carlebach, Esq.
       40 Exchange Place
       New York, New York 10005
       Tel. No.: (212) 785-3041

19